Argued July 12, affirmed October 4, 1921.

# SYVERSON et al. *v.* SERRY.

(200 Pac. 921.)

**Corporations—Evidence Held not to Show Fraud in Contract Between Incorporators and Former Owner of Business.**

1. In action by incorporators against previous owner of business for breach of agreement to pay indebtedness of business at time of conveyance of assets to corporation, and to foreclose lien on stock pledged as security for guaranty as to payment of such debts, evidence *held* insufficient to sustain defense that provision as to payment of debts did not accord with prior oral agreement and was fraudulently incorporated in writing, without defendant's knowledge, and was omitted therefrom when contract was read prior to being signed by defendant.

**Corporations—Incorporators Held Entitled to Sue Former Owner on His Agreement to Pay Debts Existing at Time of Assignment of Assets to Corporation.**

2. Where owner of business in contract with other incorporators agreed to pay indebtedness existing at time of assignment of assets to corporation, the incorporators, having furnished the corporation with money wherewith to pay judgment recovered against former

2. Rights and liabilities of promoters of corporation *inter se,* see note in Ann. Cas. 1913E, 1166.

Promoters of corporation and their relations thereto, see note in 17 Am. St. Rep. 161,

owner to avoid enforcement of lien against assets that had been assigned to corporation, *held* entitled to sue such former owner as against contention that the right of recovery was in the corporation.

**Corporations—Incorporators' Failure to Pay Former Owner Balance of Amount Due for Conveyance of Assets Held not to Preclude Their Suit on Agreement to Pay Existing Debts.**

3. Where former owner of business of corporation broke his agreement with incorporators to pay indebtedness existing at the time of assessment of assets to corporation, the incorporators could maintain an action against him, notwithstanding their failure to pay such owner the balance of amount due for conveyance of assets to corporation.

**Fraudulent Conveyances—Sale Good as Between Buyer and Seller Notwithstanding Noncompliance With Bulk Sales Act.**

4. Noncompliance with Bulk Sales Act does not affect validity of sale as between seller and buyer.

**Corporations—Formal Delivery of Stock to Former Owner of Assets and Delivery to Incorporators Unnecessary to Foreclosure of Lien on Stock for Breach of Agreement to Pay Debts.**

5. Where owner of business, in contract with other incorporators, agreed to deposit the stock to be issued to him to such incorporators, as security for his contract to pay existing debts, and "hereby assigns" such stock to incorporators, the incorporators could foreclose a lien on such stock on owner's breach of the guaranty, though the stock had not been formally delivered to such owner and thereafter formally delivered by owner to such incorporators.

**Equity—Regards That as Done Which Should have Been Done.**

6. Equity regards that as done which should have been done.

From Clackamas: J. U. CAMPBELL, Judge.

Department 1.

This is a suit for a money decree and to foreclose a lien on corporate stock pledged as security for a guaranty contained in a written contract. The defendant prayed for a cancellation of the contract on the ground that it did not conform with the agreement actually made and for the reason that the signature of the defendant had been procured by fraudulent representations. After hearing the evidence, the trial court granted the plaintiffs, M. Syverson and J. W. Moore, a decree against the defendant John J. Serry, for the sum of $1,000 and ordered that the cor-

porate stock, owned by the defendant and held by the plaintiffs as security, be sold to satisfy the money decree.  The defendant appealed.        AFFIRMED.

For appellant there was a brief over the names of *Mr. R. F. Shields* and *Mr. W. C. Winslow,* with an oral argument by *Mr. Shields.*

For respondent there was a brief and an oral argument by *Mr. W. B. Shively.*

HARRIS, J.—The controversy arose out of the following written contract:

"Agreement Between John J. Serry, M. Syverson and J. W. Moore.

"The parties agree to organize the Gates Mill Co., a corporation, with a capitalization of $10,000.  Each agrees to subscribe and pay for $2,000 in stock. Syverson and Moore are to pay cash and Serry is to convey to the corporation the entire present plant and equipment, lease, timber contracts, rights of way, goodwill and all other assets, except lumber now manufactured and accounts receivable of business known as Gates Lumber Company the same to be conveyed free of all liens and all debts paid except only the balance unpaid on the contract between Serry and Schroeder Bros. & Co., which balance shall not exceed $3,000.

"As additional consideration for said conveyance Syverson and Moore each agree to pay Serry in cash the sum of $133.33 or $266.66 for both said Syverson & Moore.  Serry agrees to satisfy said Syverson & Moore and hereby guarantees that the liens and all outstanding debts, claims and demands whatsoever against or owing by said Gates Lumber Co. and or himself, the said Serry, do not exceed the sum of $3,000 and as collateral security for said guaranty agrees to deposit with and hereby assigns to said Syverson and Moore 2,000 shares of stock in said

Gates Mill Co.   Serry acknowledges receipt of $90 on account of the above additional consideration.

"Gates, Oregon, July 5, 1918.

"M. SYVERSON.    (Seal)
"By H. SYVERSON.
"JOHN J. SERRY.    (Seal)
"J. W. MOORE.    (Seal)"

This written contract was preceded by an oral agreement, or at least by a supposed oral agreement, and certain occurrences which must be first explained before this controversy can be fully understood.

Schroeder Bros. & Co. owned a sawmill near Gates in this state and contracted to sell it to Serry for $3,500.   Serry paid $500 on the purchase price, took possession of the property pursuant to the terms of the contract of sale, and agreed to pay the balance at a specified future time.   O. C. Dike owned the land upon which the sawmill was located; but Serry held a lease covering the land.   Serry did not own any standing timber; but he had a contract which enabled him to cut timber standing on lands owned by E. K. Cramer. Serry and a partner operated the mill for a period of time not definitely shown.   Serry acquired the interest of his partner and continued to operate the mill alone until June 23, 1918, when negotiations, which had been begun only a few days previously, culminated in an oral agreement, or at least a supposed oral agreement, between the plaintiffs and the defendant.   Serry and his partner and also Serry as sole operator of the mill did business under the assumed name of Gates Lumber Company.

M. Syverson is the wife of H. Syverson; the latter acted throughout the negotiations as the agent of the former who it may be added was apparently the moneyed one of the two.   H. Syverson and his wife

together with the plaintiff J. W. Moore visited the mill and inspected the premises. On June 23, 1918, the Syversons, Moore and Serry met in Salem; and then and there Serry delivered to the plaintiffs his contract with Schroeder Bros. & Co. together with all other contracts owned by him, including the contract with Cramer. On that day the parties either agreed, or at least believed that they had agreed upon the terms under which the plaintiffs were to acquire an interest in the sawmill property. This oral agreement required the formation of a corporation and it was understood that the plaintiffs were to attend to the business of organizing the corporation. It was understood that each party was to subscribe for and receive a certain number of shares of stock in the corporation, that Serry should pay for his stock by transferring to the corporation his interest in the sawmill property, and that the plaintiffs should pay cash for their respective shares of stock. On June 23d, there was a quantity of manufactured lumber in the yard at the mill site. Serry had sold and shipped some lumber for which he had not yet been paid. Although the record is not entirely clear, nevertheless we infer that immediately after June 23d, the plaintiffs assumed the management of the mill. At any rate, we understand that on June 27th the plaintiffs purchased a donkey-engine and with their own money paid $1,000 on the price of it; and, furthermore, Moore immediately began to work at the mill. It is proper in this connection to state that Serry continued to work at the mill.

The plaintiffs caused articles of incorporation to be signed and filed with the proper officers on June 28th for the incorporation of the Gates Mill Co. with

a capital stock of $10,000 divided into 10,000 shares of the par value of $1 per share.

On July 5, 1918, H. Syverson, Moore and W. B. Shively, an attorney who was representing the plaintiffs, met with Serry at his home near Gates for the purpose of preparing the necessary legal papers. At once it developed that the parties either had not thoroughly understood each other when they parted upon June 23d, or else there was an unwillingness on one side or the other to abide by what had been orally agreed upon. The plaintiffs claim that each of them was to subscribe for 2,000 shares of stock and that the defendant was to subscribe for the same number of shares. Serry testified that the plaintiffs were to pay $5,000, or $2,500 each, into the treasury for the stock received by them; but the plaintiffs say that each of them agreed to pay $2,000 and no more. We understand, not from Serry's pleading but from his testimony, that Serry admits that it was finally agreed that he was to receive 2,000 shares of stock; but we also understood that he claims that he was to receive something more than 2,000 shares of stock for his interest in the sawmill property. There is evidence to the effect that on July 5th Serry insisted that he was entitled to $3,000 for his interest and that each of the plaintiffs should pay $2,500 into the treasury of the corporation. The plaintiffs claimed that the parol agreement made on June 23d provided for the issuance of 2,000 shares of stock to each of the three parties to the suit; that the defendant was to transfer his interest in the sawmill property in payment for his stock; and that each of the plaintiffs was to pay $2,000 into the treasury of the corporation for his or her stock. There is also evidence in-

dicating that possibly the parol agreement included a definite understanding that Serry's interest was figured at $2,000 accompanied by an indefinite understanding as to whether he should be paid wholly or only partly with shares of stock; for H. Syverson testified that he stated to Serry on July 5th, "we talked over regarding your stock, that possibly that you would want to take fifteen hundred in shares and five hundred in cash." The discussion began about 1 P. M. on July 5th and continued without interruption until finally just before H. Syverson, Moore and Shively went "down to the hotel to supper," a compromise was reached. Under the terms of the compromise the plaintiffs and Serry were each to subscribe for 2,000 shares of stock; each of the plaintiffs was to pay for his or her stock $2,000 in cash to the treasurer of the corporation; and in addition to the stock to be issued to Serry he was to receive from the plaintiffs $266.66 in cash.

When H. Syverson, Moore and Shively returned from supper, all the interested parties got together and proceeded to take the necessary steps to complete the organization of the corporation. M. Syverson, through her agent H. Syverson, subscribed for 1,999 shares of stock. H. Syverson subscribed for one share; Serry and Moore each subscribed for 2,000 shares. Serry and the other subscribers signed a written waiver consenting that the first meeting of stockholders be held at 9:45 P. M. on July 5th. At this first meeting of the stockholders, by-laws were adopted and the two Syversons and Moore were unanimously elected directors.

In addition to taking part in the organization of the corporation, at some time after supper Serry

signed the contract, which has been already quoted in full, and he also signed a bill of sale together with an affidavit giving a list of his creditors and the amounts due them in conformity with the Bulk Sales Act: Sections 8161–8164, Or. L.   Under the terms of the bill of sale Serry transferred to the Gates Mill Company:

"The entire present plant, equipment, tools, lease, timber contracts, rights of way, goodwill and all other assets except only the lumber now manufactured and accounts receivable of Gates Lumber Co., a business now owned entirely by me, free and clear of all liens, claims, demands and debts whatsoever, excepting only the unpaid balance not exceeding $3,000 of the contract between myself and Schroeder Bros. & Co., dated July 20, 1917."

According to the affidavit made on July 5th, Serry owed the aggregate sum of $2,168.82 to twenty-three creditors in addition to the balance of $3,000 remaining unpaid on the contract with Schroeder Bros. & Co.

H. Syverson and his wife and Moore paid to the corporation a total of $4,000 in cash for the stock subscribed for by them.  A certificate for 2,000 shares of stock was issued in the name of Serry, but was delivered to the plaintiffs to be held as security for the guaranty contained in the contract of July 5th.

Serry had a contract with Weaver Clark under the terms of which the latter had done the work of delivering logs at the mill.  According to the affidavit made on July 5th, Serry owed Clark $490.  However, on July 8th, three days after making the affidavit, Serry confessed judgment in favor of Clark in the sum of $1,402.50.  A writ of execution was immediately issued.  The sheriff levied upon the mill prop-

erty and gave notice that he would sell the property on July 26th. At the appointed time the sheriff sold the mill property to Weaver Clark for $1,200. As we understand the record the plaintiffs did not learn of the Clark judgment until the 13th or 14th of July; and on July 15th, acting through their attorney, the plaintiffs wrote to Serry demanding that he satisfy the Clark judgment and protect the plaintiffs in conformity with his guaranty. Serry did nothing, with the result that the plaintiffs were themselves obliged to provide the necessary funds with which to satisfy Clark. On August 10, 1918, Clark conveyed to the Gates Mill Company all the interest which he had acquired in the mill property by virtue of his purchase at the sale on execution, and he also transferred to the corporation the judgment obtained by him on July 8th against Serry. Clark was paid $1,000; but the money was furnished by the plaintiffs.

In their complaint the plaintiffs recite the contract of July 5th, narrate the circumstances connected with the Clark judgment, and then, based upon the contract and the purchase of the Clark judgment, pray for a decree against Serry for $1,000 and for a sale of the shares of stock held by the plaintiffs as security.

The answer gives the defendant's version of the oral agreement, and then proceeds with averments of fraudulent representations. According to the answer it was agreed that the plaintiffs and H. Syverson would organize a corporation to be known as the Gates Mill Co.; that stock should be issued—

"to the amount of $6,500, $2,133 of said stock to be issued to defendant for a portion of his interest in the mill and the remainder of said stock to be issued to plaintiffs and the said H. Syverson; and said plaintiffs and the said H. Syverson were to pay the

said defendant the sum of $333 as the difference between the value of his equity in said mill and the amount of stock to be issued to him."

It will be recalled that, besides the balance of $3,000 unpaid on the purchase price of the mill, the defendant owed different creditors debts, aggregating $2,168.82, which he had incurred in the operation of the mill. In the answer the defendant avers that the plaintiffs and H. Syverson agreed immediately to advance the necessary moneys for the payment of this indebtedness, and that it was further agreed by all parties that the plaintiffs and H. Syverson should repay themselves by selling the manufactured lumber then on the yard at the mill and by collecting moneys due on lumber already sold, and after they had repaid themselves the balance should be paid to the defendant. The answer continues by alleging that—

"at said time it was further understood and agreed that the stock to be issued to defendant in said corporation should be retained by plaintiffs and the said H. Syverson as additional security to protect them in the repayment of the moneys advanced by them to pay up said indebtedness referred to herein."

The answer gives an account of the alleged fraud relied upon by the defendant. It is averred that the plaintiffs, H. Syverson and their attorney—

"came to this defendant, and falsely and fraudulently represented to this defendant that they desired to have defendant make an assignment of the stock of said corporation to them, and that the agreement mentioned in paragraph two of the amended complaint herein (the contract of July 5th) was such an agreement and that it had for its sole purpose the assignment of said stock, and further represented that the same was entirely in accord with the oral agreement theretofore entered into between the parties, and then and there pretended to read said agree-

ment to this defendant, but in doing so, misread the
same, or did not read it to this defendant as it now
reads.''

The defendant alleges that he did not know that
the name of H. Syverson had been omitted from the
contract; that he did not know that the—

"agreement contained a provision making any guar-
antee that the claims against the Gates Lumber Com-
pany and himself did not exceed the sum of $3,000,
nor did said defendant know that said contract con-
tained a provision providing for the organization of
said corporation at the capitalization of $10,000, said
parties having represented to defendant that said
corporation had already been organized at a capitali-
zation as provided for by the agreement set forth.''

1. The issue of fraud must in every particular be
resolved against the defendant. The testimony of
the defendant is not corroborated by that of any
other witness; but upon the contrary every other
witness who spoke upon the subject contradicted the
defendant; and, moreover, every written document
relevant to the subject likewise contradicts the de-
fendant. The parties began talking at about 1 P. M.
on July 5th and continued their talk until supper
time before a definite understanding was finally
reached. The parties again met after supper and it
was not until 11 P. M. that the business was com-
pleted. The contract, bill of sale, and affidavit were
signed by the defendant after supper. There was no
hurry. The business was transacted deliberately and
without haste. The clear preponderance of the evi-
dence is that the contract was correctly read and ex-
plained to the defendant. before he signed it. In
addition to the contract, the bill of sale makes it clear
that the defendant agreed to sell the mill property

free from all claims except the balance due Schroeder Bros. & Co. The contention of the defendant is that the plaintiffs and H. Syverson agreed to pay the indebtedness which Serry had incurred while operating the mill under the name of Gates Lumber Co., and that the plaintiffs would look to the manufactured lumber then on the yard and to the accounts receivable for reimbursement. The plaintiffs say that they of course knew of the indebtedness set forth in the affidavit; that it was understood that the defendant would himself pay this indebtedness by selling the lumber, which was excluded from the contract and bill of sale, and by applying the proceeds derived from the sale of such lumber, together with moneys collected on the then accounts receivable. In other words, the defendant sold his interest in the mill subject to the balance of $3,000 unpaid to Schroeder Bros. & Co., but free from all other claims. According to the preponderance of the evidence the plaintiffs did not agree to assume any indebtedness which had been previously incurred by Serry in the operation of the mill; but, on the contrary, the overwhelming weight of the evidence is to the effect that the defendant agreed to pay such indebtedness. The defendant is not entitled to a cancellation of the contract.

It is further argued by the defendant that even though it be held that the contract shall not be canceled, no recovery can be had because: (1) The plaintiffs did not show any damage to themselves personally, but the right of recovery, if any exists, is in the corporation; (2) the plaintiffs did not make the payments which they agreed to make; (3) the plaintiffs did not comply with the Bulk Sales Act; and (4) the

stock in question was never issued or delivered to the defendant and no lien attached.

2. The undisputed evidence is that Moore and M. Syverson each furnished to the corporation $500, or a total of $1,000, for the express purpose of paying Clark. Clark was actually paid $1,000 and every cent of the money was furnished by M. Syverson and Moore. When viewed in the light of the attending circumstances, the transaction was one where in the final analysis the plaintiffs purchased a release of Clark's claim for the benefit of the corporation. The plaintiffs are entitled to maintain this suit.

The plaintiffs did not pay to the defendant the full sum of $266.66 as required by the contract. On June 23d Serry was paid $100. Serry expended $10 of this amount for the benefit of the corporation and the remaining sum of $90 was credited to the plaintiffs when the contract was drawn on July 5th. The defendant has never made formal demand for the unpaid balance of $176.66; the plaintiffs have not refused to pay further than to say that the money has been garnished. In the affidavit made by Serry he stated that he owed E. K. Cramer $288.42; but subsequently Serry confessed judgment in favor of Cramer for $714.50. Cramer was paid and the judgment assigned to W. B. Shively, the attorney for the plaintiffs. After the assignment of the judgment an execution was issued and the plaintiffs garnished. We infer, however, that the money which was paid to Cramer was furnished by the plaintiffs; that in reality the plaintiffs own the Cramer judgment; and that the assignment of the judgment was made to Shively merely "to avoid confusion." The garnishment proceeding, in the circumstances presented here, did not

of itself excuse the plaintiffs, and hence the proceeding may be dismissed from further consideration.

3. But there are other facts which must enter into the calculation. Serry had breached his guaranty, for on July 5th he swore that he owed Clark $490, and three days afterwards he confessed a judgment in favor of Clark for $1,402.50. On July 5th Serry said that he owed Cramer $288.42, and subsequently he confessed a judgment for $714.50. It is true that Serry explained that under his contract with Clark and Cramer the money for the logging and the stumpage did not become due except as the manufactured lumber was sold, loaded and "billed out," and that as stated in the affidavit only $490 was due Clark and $288.42 was due Cramer on July 5th on account of lumber "billed out"; but the fact still remains that both judgments covered not only lumber "billed out" but also lumber in the yard and logs in the pond not "billed out." There is no evidence indicating that the plaintiffs knew that the affidavit was designed to cover only the lumber "billed out"; and a person reading the affidavit in the light of the contract and bill of sale would naturally understand it to mean exactly what the plaintiffs understood it to mean. In the language of M. Syverson "we held it ($176.33) up because it was in such a mess I did not know what we would do." As already explained the plaintiffs did not affirmatively refuse to pay, although they did not actually pay. The defendant had breached one of his covenants, indeed one of the principal covenants, and therefore on the authority of *Henry* v. *Hand,* 36 Or. 492 (59 Pac. 330), the failure of the plaintiffs to pay the balance of $176.66 does not preclude them from maintaining this suit.

Under date of July 6th the Gates Mill Company sent notices to all the creditors named in the affidavit informing them that the corporation proposed to buy "the present plant, equipment, tools, timber contracts and other assets of" Serry. On July 8th the plaintiffs caused to be mailed to each such creditor a supplementary letter which, after referring to the notice of July 6th, advised

"that it is not proposed to purchase the manufactured lumber on any accounts receivable which are to be retained by Mr. Serry, and out of which he expects to pay his indebtedness."

The defendant says that the notice issued on July 6th was interpreted by the creditors to mean that the corporation proposed to buy all the assets of Serry, and that for that reason the creditors became greatly excited and "brought suits referred to in plaintiffs' amended complaint." It is our conclusion from the evidence that if the two notices had been mailed together on July 6th the result would have been the same so far as the Clark judgment is concerned. The Cramer judgment was entered after the second letter was mailed to the creditors.

4. The defendant contends that the plaintiffs and the corporation failed to comply with the Bulk Sales Act; that the law concerning sales in bulk is as much a part of the contract as though actually written in it; and that therefore the plaintiffs breached their contract. This argument proceeds upon the theory that the notice of July 6th declared that the Gates Mill Co., proposed to purchase *all* the assets owned by Serry doing business as the Gates Lumber Co. The word "all" does not appear in the notice. The words are "and other assets"; and this language is capable of more than one construction. However,

even though it be assumed for the purposes of this discussion that the notice means "all" assets, it cannot aid the defendant. As between the vendor and the vendee a sale is good and not void even though there has been a failure to comply with the Bulk Sales Act: *Benson* v. *Johnson,* 85 Or. 677, 683 (165 Pac. 1001, 167 Pac. 1014).

5, 6. It is argued by the defendant that since the stock certificate which was issued in the name of Serry was not actually delivered to Serry before delivery to the plaintiffs, no lien attached. When the parties signed the contract the certificate of stock had not yet been issued. It was known that stock certificates would be issued and that the plaintiffs and H. Syverson would attend to all the details; and it is manifest that these circumstances were in the minds of the parties when the words "hereby assigns to said Syverson and Moore 2,000 shares of stock" were inserted in the contract. Formal delivery to Serry followed by formal delivery to the plaintiffs would have been a vain and idle ceremony. The language of the contract contemplated that Serry's certificate would be delivered to the plaintiffs immediately upon its issuance. There was a strict compliance with the terms of the contract. Moreover, "equity regards that as done which should have been done": *Gile & Co.* v. *Lasselle,* 89 Or. 107, 117 (171 Pac. 741).

The decree is affirmed.          Affirmed.

Bean, Johns and McBride, JJ., concur.